# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RANDY MAYFIELD, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | No. 09-2033-KHV |
| ) | |
| JOHN MERCHANT, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Randy E. Mayfield filed suit against John Merchant, Sheriff of Brown County, Kansas, for violation of his First Amendment rights under 42 U.S.C. § 1983. Plaintiff, a former deputy sheriff in Brown County, alleges that defendant fired plaintiff for running against him in the Republican primary election for Brown County Sheriff in August of 2008. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #40) filed September 3, 2010. For reasons stated below, the Court sustains defendant's motion.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the non-movant.

In 1992, the Brown County Sheriff's Department ("Department") hired plaintiff as a deputy. In July of 1995, plaintiff left the Department and took a job working with Lamar Shoemaker at the

Police Department in Horton, Kansas. In late 1996, Shoemaker left Horton to become Sheriff of Brown County. Shortly thereafter, Shoemaker re-hired plaintiff as a deputy with the Department. In 2007, Shoemaker promoted plaintiff to technical sergeant. Shoemaker also hired plaintiff's wife, Evva Mayfield, as dispatcher for the Department.

For some 23 years, defendant worked as a janitor at a school in Hiawatha, Kansas. In 2006, the Police Department in Hiawatha, Kansas hired defendant as a police officer.

In February of 2008, Shoemaker resigned as Sheriff of Brown County. On March 6, 2008, plaintiff filed to run as a Republican candidate for Sheriff in the primary in August of 2008. Also in early March of 2008, both plaintiff and defendant John Merchant announced their intentions to seek appointment as Sheriff for the remaining portion of Shoemaker's term (through the election in November of 2008).

Shoemaker informally picked plaintiff to be his successor as Sheriff, and plaintiff was confident that he would be appointed. On March 18, 2008, however, the Republican Central Committee of Brown County announced that it had chosen defendant to fill the remainder of Shoemaker's term.[1] To fill Shoemaker's position, defendant left his job in the Police Department of Hiawatha. On April 7, 2008, he also filed to run against plaintiff as a Republican candidate for Sheriff in the primary in August of 2008.

Immediately after defendant's appointment was announced, plaintiff and his wife asked defendant if he would retain them. Defendant told them that he did not have plans to fire anyone in the Department. On several other occasions, plaintiff's wife asked that defendant give plaintiff

---

[1] Daniel Siebenmorgan, a deputy sheriff, testified that Department employees disagreed about whether defendant should have appeared in person before the Republican Central Committee to seek the nomination. See Siebenmorgan Affidavit ¶ 10.

some time to adjust. Defendant understood this request to refer to plaintiff's disappointment because he did not receive the appointment as Sheriff.

Between March and August of 2008, the Department had approximately 18 to 20 paid employees. The Department included some six to eight law enforcement officers and five volunteer reserve officers. A number of Department employees supported plaintiff's campaign for Sheriff including deputies Randy Linck and Cory Lay. Defendant and Daniel Siebenmorgen testified that the competing campaigns created tension between plaintiff and defendant and between other members of the Department.[2] Linck testified that as far as plaintiff performing his duties and plaintiff's work with Linck, it was "business as usual" during the campaign. Linck Depo. at 18.

Defendant testified that during the campaign, he noticed that plaintiff acted increasingly curt, standoffish, and angry toward him and other employees.[3] Defendant thought that plaintiff's attitude stemmed in part from defendant's appointment as Sheriff and plaintiff's belief that he should have received the appointment. Defendant admits, however, that this belief was purely speculative. Defendant testified that he noticed a change in plaintiff's demeanor toward others in the Department that made them nervous. At one point during the campaign, when defendant asked plaintiff to help explain how to enter data in the Interpol computer database, plaintiff tossed the Interpol manual on defendant's desk and said "there you go."

---

[2] Defendant believed that plaintiff was responsible for causing a split between Department employees, which resulted in diminished communication between employees and reduced efficiency. Siebenmorgen believed that the campaign created divisions between employees and that these divisions impaired communication between employees, reduced employee productivity and caused disagreements. Kevin Tilley, a deputy reserve officer, testified that during the campaign, he noticed tension in the Department.

[3] Plaintiff testified that his relationship with defendant remained the same.

During the primary campaign in 2008, Department employees used work computers to view blogs related to the election on HiawathaWorldOnline.com. Some of the comments posted on these blogs were distracting to Department employees because the comments insulted defendant. Department employees generally were aware that employees had written some of the comments on the blogs because they recited facts that only Department employees would have known. Plaintiff did not attempt to address the comments posted on these blogs.

Defendant testified that Cory Lay spent a considerable amount of time with plaintiff during the campaign. Defendant believed that Lay's relationship with plaintiff caused Lay to drag his feet and caused a rift between Department employees. Defendant believed that plaintiff's candidacy for Sheriff caused Lay to be insubordinate.[4]

Near the end of the campaign shortly before the primary election, defendant decided that after the primary – win or lose – he or plaintiff had to leave the Department. Defendant testified as follows:

> [t]here was - seemed to be so much turmoil, just so much animosity, so much of a split down there at the Sheriff's Office. And to me, it just - I couldn't allow it to continue any further. So I made up my mind if the folks wanted Randy as their sheriff, I was going to resign the next day; and if it was me that got elected, then I had to do something, because I couldn't let it go on. We were at the point where it was officer safety, it was affecting people's jobs, and I just - I wasn't going to allow it.

Merchant Depo. at 91. Defendant testified that he noted that in effect, the campaign created a situation where employees had two bosses and these competing loyalties hampered the Department's

---

[4] Siebenmorgen testified that Lay's support of plaintiff's campaign adversely affected his relationship with Siebenmorgen even though Siebenmorgen did not side with a particular candidate. Siebenmorgen testified that because of the tension created by the election, he and Lay spoke only when it had to do with work.

-5-

ability to function safely and effectively. Id. at 150.

On August 5, 2008, plaintiff and defendant both appeared on the Republican ballot in the primary election. Defendant won. The following day, defendant told plaintiff that he could either resign or be fired. Plaintiff refused to resign and defendant terminated his employment. Defendant told plaintiff that the "guys looked up to you for guidance" and you could have done certain things but you chose differently. Mayfield Depo. at 34-35; see Linck Depo. at 10-11 (defendant told plaintiff that he should have taken care of people under him during campaign but he did not do so). Plaintiff and Linck, who was present when defendant notified plaintiff of his termination, testified that defendant did not explain what plaintiff should have done differently and they did not know what he meant by the comment. See Linck Depo. at 11; Mayfield Depo. at 35-36 ("don't know what he meant by things I could have done differently because I never knew what that was").

Defendant testified that he fired plaintiff because he believed that it was necessary to restore order and eliminate divisions in the Department. Defendant testified that he believed that he had no choice but to fire plaintiff because some members of the Department looked up to him and – despite this fact – plaintiff did not take any steps to repair or limit the divisions that had arisen between employees during the campaign.[5]

On January 22, 2009, plaintiff filed suit against defendant for violation of his First Amendment rights under 42 U.S.C. § 1983. Defendant seeks summary judgment on plaintiff's claim.

---

[5] Siebenmorgen testified that he agreed with defendant's decision and that he personally did not know of any other option to remedy the divisions that had developed between employees. He testified further that after plaintiff and his most vocal supporters left the Department after the election, the tension and divisions in the Department largely subsided.

## **Analysis**

In his only claim, plaintiff alleges that defendant fired him because of his lawful campaign for Sheriff. See Pretrial Order (Doc. #39) at 5. The parties agree that the First Amendment does not protect a public employee's right by itself to be a candidate or to conduct a campaign.[6] Plaintiff notes, however, that his claim is premised upon "statements made during his campaign, not . . . his candidacy alone." Plaintiff's Response (Doc. #44) at 13. In a First Amendment retaliation case, however, plaintiff must identify the particular speech upon which he bases his claim.[7] See Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1276-77 n.5 (10th Cir. 2007) (general comments about importance of certain programs and rights of Native Americans too "amorphous" to allow proper analysis of content, context and form); Hullman v. Bd. of Trustees of

---

[6] The First Amendment does not give public employees a right to post-candidacy employment. Warren v. Gaston, 55 F. Supp.2d 1230, 1235 (D. Kan. 1999). In Warren, the court noted as follows:

> [I]t is one thing for an incumbent to try and fire employees who do not belong to the right party, who fail to support the incumbent, or who support the opponent. It is another for the employee to actually become the opponent and still expect continued employment. The court has been unable to find any case which has extended First Amendment interests this far . . . As in [Carver v. Denis, 104 F.3d 847 (6th Cir 1997)], there is no suggestion here that [plaintiff] was terminated because of her particular political views. Rather, the essence of Warren's case is that she was terminated because of her candidacy. Under Carver, that does not implicate a First Amendment right.

Id.; see Jantzen v. Hawkins, 188 F.3d 1247, 1252 (10th Cir. 1999).

[7] In his motion for judgment on the pleadings, defendant noted that the complaint did not contain sufficient factual allegations to put him on notice that plaintiff's First Amendment claim implicated his right to free speech rather than his right to political affiliation. The Court recognized that the complaint reflected a barebones approach to pleading, but found that it was not deficient under Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). See Memorandum And Order (Doc. #23) filed January 25, 2010 at 7.

Pratt Cmty. College, 950 F.2d 665, 668 (10th Cir. 1991) (where claim based on protected speech, pretrial order must identify with specificity protected speech alleged). On a motion for summary judgment, if plaintiff cannot identify protected statements or conduct, his claim necessarily fails. See Harvey v. Baker, 242 Fed. Appx. 547, 551 (10th Cir. 2007) (summary judgment appropriate where plaintiff did not identify specific instance of protected speech); Mitchell v. City of Moore, 218 F.3d 1190, 1199-1200 (10th Cir. 2000) (same); Hullman, 950 F.2d at 668 (same); Ewers v. Bd. of County Comm'rs, 802 F.2d 1242, 1247 (10th Cir. 1986) (same); see also Craven v. Univ. of Colo. Hosp. Auth., 260 F.3d 1218, 1226 (10th Cir. 2001) (allegation that speech was "on other matters" patently inadequate; counsel must identify specific instances of speech upon which plaintiff bases her claim); Dennison v. County of Frederick, Va., 921 F.2d 50, 54 (4th Cir. 1990) (as matter of law, where plaintiff cannot identify particular speech, symbolic or otherwise, for which he was punished, his right to freedom of speech not violated).

In the pretrial order, in plaintiff's response to defendant's statement of facts and in plaintiff's additional facts, plaintiff does not identify any specific protected speech, symbolic or otherwise. Plaintiff argues that he alleges that defendant terminated him because of "plaintiff's statements/acts" during the course of the campaign, Pretrial Order (Doc. #39) at 4; see Plaintiff's Response (Doc. #44) at 13 (plaintiff alleges termination premised on "statements made during his campaign, not by virtue of his candidacy alone, and was told as much by Defendant"), but he does not set forth any protected statements or acts. Because the pretrial order does not specify any protected speech or conduct, the Court sustains defendant's motion for summary judgment. See Hullman, 950 F.2d at 668 (where claim based on protected speech, pretrial order must identify with specificity protected speech alleged).

In an effort to evaluate plaintiff's unstated theory of his case, the Court has searched the record for particular instances of protected conduct. In the argument section of his opposition brief, plaintiff refers generally to his "candidacy," "campaign" and "statements,"[8] but again does not specify any particular statements or conduct.[9] To determine whether an employer has denied an employee his constitutional rights by terminating his employment for speaking on matters of public concern, the Court uses the test set out in <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006) and <u>Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205</u>, 391 U.S. 563 (1968), and adopted in <u>Brammer-Hoelter v. Twin Peaks Charter Acad.</u>, 492 F.3d 1192, 1202 (10th Cir. 2007). <u>See</u> <u>Dixon v. Kirkpatrick</u>, 553 F.3d 1294, 1301-1302 (10th Cir. 2009). The <u>Garcetti/Pickering</u> test examines five factors, as follows: (1) whether the speech was pursuant to the employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government interests in promoting the efficiency of the public service, as an employer, are sufficient to outweigh plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether defendant would have reached the same employment decision in the absence of protected conduct. <u>Id.</u> at 1302. The first three factors are issues of law to be decided by the

---

[8] <u>See</u> <u>Plaintiff's Response</u> (Doc. #44) at 13 (defendant terminated plaintiff for "campaign conduct"); <u>id.</u> (termination premised upon "statements made during his campaign"); <u>id.</u> at 15 (statements during course of election campaign); <u>id.</u> (plaintiff's "candidacy and campaign" involved matter of public concern); <u>id.</u> at 16 (plaintiff's "candidacy and campaign" protected under First Amendment); <u>id.</u> (speech interest in "campaigning for political office"); <u>id.</u> at 17 (terminated for "statements" during campaign); <u>id.</u> at 21 (disputed issue on impact of plaintiff's "campaign"); <u>id.</u> at 23 (termination motivated by "candidacy and campaign activities"); <u>id.</u> (terminated because of "campaign statements and acts"); <u>id.</u> at 24 (termination because of "campaign activities"); <u>id.</u> at 26 (termination because of plaintiff's "campaign activities").

[9] At one point, plaintiff states that the content of his speech "necessarily touched upon his employment history and experience as an officer." <u>Plaintiff's Response</u> (Doc. #44) at 15. Plaintiff does not further explain the nature of such speech.

Court, and the last two are factual issues to be decided by the factfinder.  Id.

Because plaintiff has not set forth specific protected conduct, the Court cannot conduct a meaningful inquiry into the pertinent factors of the Garcetti/Pickering test . In the argument section of plaintiff's opposition brief and in the context of the fourth factor, plaintiff refers to two statements that he made at some point during the campaign: (1) he told Lay that if elected, things would go back to normal and (2) he told Linck that if elected, he would appoint Linck as undersheriff.[10]  As

---

[10]  To establish that he made the statements, plaintiff relies on defendant's deposition. Defendant testified as follows:

> Q: But you don't know of any conversations that occurred between Mr. Mayfield and Mr. Lay while he was - while Mr. Lay was visiting Mr. Mayfield at his house, do you?
>
> A: Basically, just like he said, [plaintiff] promised that if I was not sheriff anymore, things would go back to normal. And they didn't like the changes, because they didn't like anybody to make them accountable, so . . .
>
> Q: In terms of Mr. Mayfield speaking in that way to Mr. Lay, did that violate any orders that you had given Mr. Mayfield?
>
> A: I just - at the start, I warned everybody I wanted them to do good jobs for the community, just do their job [to] the best of their ability. And undermining the sheriff and what [plaintiff] was trying to do in the County, yeah, that's an issue. I didn't expect him to fall all over himself or anything else, but I did expect him to do his basic job.
>
> Q: Do you think that Mr. Mayfield had the right to express what his plans would be as sheriff to Mr. Lay?
>
> A: Sure.
>
> Q: You don't differ with that do you?
>
> A: No, absolutely not. Absolutely not, but . . .
>
> Q: So you wouldn't consider it to be an act of insubordination if Mr. Mayfield

(continued...)

explained above, because plaintiff has not set forth these statements in the pretrial order or in his statements of fact, they cannot form the basis of his First Amendment claim. Even as to these statements, however, plaintiff has not offered sufficient evidence for a reasonable jury to find that protected speech was a motivating factor in the termination of his employment.

To withstand summary judgment on the fourth factor of the Garcetti/Pickering test, an employee must produce evidence which links the employer's action to the employee's speech. See Ramirez v. Okla. Dept. of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994), overruled in part on other grounds, Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1194-98 (10th Cir. 1999). In particular, the employee must show that his speech was a "substantial factor or a motivating factor"

---

[10](...continued)
spoke to Mr. Lay about what he would do if he were sheriff?

A:     Depending on the timing. I mean, if it's on County time and everything else and - or if he knew his position as sergeant would [cause] somebody to do negative work or, you know, create a negative work environment or things like that. You know, it depends on how he does it. It needs to be in a correct manner.

Q:     Any other instances that you would consider to be insubordinate attributable to Mr. Mayfield during the time you were sheriff and he - before he was terminated from the Sheriff Department?

A:     Well, he had - Randy Linck did express some concerns to me also. He said [plaintiff] had called him. He was real somber about it. And he says that - he said [plaintiff] wants him to be his undersheriff, and he said he wanted me to be very well aware of that. And - but he said, "John, I'm loyal to you. I'm not going to do anything that's going to -" and that statement there kind of struck me as odd. And I thought "well, why would you even talk to me about it then?" So then I don't know if [plaintiff] was trying to encourage or whatever, but it created an atmosphere in there for Randy to be upset. He was almost crying. And just a lot of things that had happened in the Department.

Merchant Depo. at 42-44.

in the detrimental employment decision. Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1338 (10th Cir. 2000); see Maestas v. Segura, 416 F.3d 1182, 1188-89 (10th Cir. 2005) (employee must show speech played "substantial part" in decision). Although this is ordinarily a question of fact for the jury, mere speculation about the employer's unconstitutional motive is insufficient to survive summary judgment. Id. at 1189; see Warren, 55 F. Supp.2d at 1236 (granting summary judgment, in part, because plaintiff-candidate produced insufficient evidence of retaliatory intent). Motive often can only be shown circumstantially, because the ultimate fact of retaliation turns on defendant's state of mind, which is particularly difficult to establish by direct evidence. Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003); Smith v. Maschner, 899 F.2d 940, 949 (10th Cir. 1990). On the other hand, speculation, rumor and innuendo are insufficient. See Perez, 339 F.3d at 56.

As plaintiff notes, defendant fired plaintiff because of unspecified things which he should have done during the campaign. See Mayfield Depo. at 34-35 (defendant told plaintiff that "guys looked up to you for guidance" and you could have done certain things during the campaign but you chose differently); Linck Depo. at 10-11 (defendant told plaintiff that he should have taken care of people under him during campaign but he did not do so). Plaintiff and Linck, who was also present when defendant notified plaintiff of his termination, testified that defendant did not explain what plaintiff should have done differently and they did not know what he meant by the comment. See Linck Depo. at 11 (did not understand what defendant was alluding to in comment that plaintiff should have taken care of something while he was campaigning); Mayfield Depo. at 35-36 ("don't know what he meant by things I could have done differently because I never knew what that was"). In his deposition, defendant testified that he was concerned about how Lay and Linck were reacting

at work. He testified that he thought that plaintiff might be encouraging Lay to drag his feet at work and causing Linck to be upset at work. See Merchant Depo. at 41-44. Plaintiff concedes that defendant believed that plaintiff's candidacy for Sheriff caused Lay to be subordinate. See Plaintiff's Response (Doc. #44) at 5, Response To Statement Of Fact ¶ 42. In sum, plaintiff has not presented sufficient evidence for a reasonable jury to conclude that in substantial part, defendant fired plaintiff because of plaintiff's statement to Lay that if elected, things would go back to normal or plaintiff's promise to Linck to name him undersheriff.[11] The Court therefore sustains defendant's motion for summary judgment on this additional ground.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #40) filed September 3, 2010 be and hereby is **SUSTAINED**.

Dated this 17th day of December, 2010 at Kansas City, Kansas.

> s/ Kathryn H. Vratil
> KATHRYN H. VRATIL
> United States District Judge

---

[11] Temporal proximity between the protected speech and adverse employment action may suggest a retaliatory motive; standing alone, however, it will not conclusively establish such motive. Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon County, 587 F.3d 1223, 1240 (10th Cir. 2009); Baca v. Sklar, 398 F.3d 1210, 1222 (10th Cir. 2005); Butler v. City of Prairie Vill., 172 F.3d 736, 746 (10th Cir. 1999); Marx v. Schnuck Mkts., 76 F.3d 324, 329 (10th Cir. 1996). Here, plaintiff does not assert temporal proximity and in any event, he does not set forth when he made the alleged statements.